## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**CURTIS E. BLACKWELL, II,**
    Plaintiff,       Case No. 20-cv-

                Hon.

v.

**JONES DAY LAW FIRM,** a corporation**,**
**MARK DANTONIO,** in his individual capacity as the Head Football Coach for Michigan State University**,**
**LOUIS P. GABEL,** in his individual capacity as a lawyer for the Jones Day Law Firm and outside counsel for Michigan State University**, and**
**THOMAS KIENBAUM,** in his individual capacity as counsel for Mark Dantonio, Mark Hollis, and Lou Anna Simon,
    Defendants.
_____

**ANDREW A. PATERSON (P18690)**
Attorney for Plaintiff
2893 E. Eisenhower Pkwy
Ann Arbor, MI 48108
(248) 568-9712
aap43@outlook.com
_____

There is another civil action between Plaintiff and Detectives Chad Davis and Sam Miller, who are not defendants in this action, pending in U.S. District Court for the Western District of Michigan, *Blackwell v Simon, et. al*., 18-cv-1261, U.S. District Judge Janet Neff.[1]

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

---

[1] Plaintiff's sole Fifth Amendment claim against Defendant Mark Dantonio in the federal civil case in the Western District of Michigan was dismissed with prejudice.  Plaintiff also has pending in the Wayne County Circuit Court a separate civil case alleging various state claims against Defendant Mark Dantonio and other MSU officials. *See* Wayne County Case No. 20-003672-CD.

**NOW COMES** Plaintiff, CURTIS E. BLACKWELL, II, by and through his

attorney, ANDREW A. PATERSON, and for his Complaint and Demand for Jury

Trial, states as follows:

## I.    NATURE OF PLAINTIFF'S CLAIMS

1. Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§

   1331, 1337, 1343, and 1367; and, the Declaratory Judgment Act, 28 U.S.C.

   § 2201, *et. seq.*

## II. **JURISDICTION AND VENUE**

2. This Court has jurisdiction over Plaintiff's claims pursuant to 42 U.S.C.

   1983; 28 U.S.C. §§ 1331, 1332, 1337, 1343, and 1367.

3. This Court also has jurisdiction to render and issue a declaratory judgment

   pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*

4. Venue is proper in the Eastern District of Michigan under 28 U.S.C. §

   1391(b)(1). Under 28 U.S.C. § 1391(b)(1), venue is proper in "a judicial

   district in which any defendant resides, if all defendants are residents of the

   State in which the district is located."   Upon information and belief, all of

   the named Defendants are residents of the State of Michigan or have a place

   of business in the State of Michigan, and at least one of the Defendants

resides in the Eastern District of Michigan. Therefore, venue is proper within the Eastern District of Michigan under 28 U.S.C. § 1391(b)(1).[1]

## III.   PARTIES

5. Plaintiff repeats, realleges and incorporates, the foregoing allegations, as though fully set forth and stated herein.

6. Plaintiff, Curtis E. Blackwell II **("Plaintiff" or "Plaintiff Blackwell")**, is a resident and registered elector of the County of Wayne, State of Michigan. Plaintiff Blackwell is also co-founder and President of Sound Mind Sound Body Foundation **("Sound Mind Sound Body" or "SMSB")**, a Michigan nonprofit corporation based in Wayne County, Michigan.

7. Defendant, Jones Day Law Firm ("**Defendant Jones Day**"), is a law firm that has offices all over the world, with offices in 18 separate cities in the United States, including an office in Detroit, Michigan. Defendant Jones Day was retained by Michigan State University **("MSU")** to perform an investigation of the MSU football program's institutional response to allegations of sexual

---

[1] Under 28 U.S.C. § 1391(b)(1) venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." Furthermore, under 28 U.S.C. § 1391(c)(2), a corporation is deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction." The determination of the proper venue for a civil action in federal court is "generally governed by 28 U.S.C. 1391." *Atlantic Marine Const. Co. v U.S. District. Court for W.Dist. of Texas*, 571 U.S. 49,, 55 (2013). "[T]he court must determine whether the case falls within one of the three categories set out in 1391(b). If it does, venue is proper[.]" *Id.* at 55.

assault in connection with incidents that occurred in January 2017 involving three MSU football players and in connection with the April 2017 sexual assault involving former MSU football player, Auston Robertson.

8. Defendant, Mark Dantonio ("**Defendant Dantonio**"), is the former MSU Head Football Coach. Defendant Dantonio served as the MSU Head Football Coach for 13 years from 2007 through February 2020.

9. Defendant, Louis P. Gabel ("**Defendant Gabel**"), is a lawyer employed by the Defendant Jones Day's at its Detroit, Michigan office.  Defendant Gabel was one of two lawyers who performed the investigation of the MSU football program's institutional response for Defendant Jones Day.  Upon information and belief, Defendant Gabel was the "chief" investigator who led the investigation for Defendant Jones Day.

10. Defendant, Thomas Kienbaum ("**Defendant Kienbaum**"), is a lawyer that was retained as outside counsel to represent Defendant Dantonio, Mark Hollis ("Hollis"), and Dr. Lou Anna Simon ("Simon") in the federal civil action of *Blackwell v Simon, et. al*., 18-cv-1261, U.S. District Court for Western District of Michigan.

11. An actual controversy exists between the Plaintiff and the named Defendants.

## IV.   <u>GENERAL ALLEGATIONS AND STATEMENT OF FACTS</u>

12. Plaintiff repeats, realleges and incorporates, the foregoing allegations, as though fully set forth and stated herein.

### Defendant Dantonio's Courtship of Plaintiff Blackwell

13. Defendant Dantonio met Plaintiff when he first attended Plaintiff's Sound Mind Sound Body annual summer football camp, a camp organized by SMSB for student-athletes to learn athletic and life skills in the game of football and to be observed by collegiate football coaches that could consider campers as potential recruits for their collegiate football programs.

14. Defendant Dantonio attended approximately 5 or 6 Sound Mind Sound Body annual summer football camps in the Detroit area before 2013 when he hired Plaintiff to work on his MSU football staff.

15. All of the Sound Mind Sound Body annual summer football camps that Defendant Dantonio attended took place in the Detroit area.

16. Some of the Sound Mind Sound Body annual summer football camps that Defendant Dantonio attended took place at Wayne State University in Detroit, Michigan.

17. Defendant Dantonio has said that his purpose for attending the Sound Mind Sound Body annual summer football camps was to give back to the

community, while also looking forward towards possible recruiting of campers.

18. Employees on Defendant Dantonio's MSU football staff also attended Plaintiff's Sound Mind Sound Body annual summer football camps.

19. During most years, the majority of Defendant Dantonio's full-time staff attended Plaintiff's Sound Mind Sound Body annual summer football camps.

20. Defendant Dantonio continued to attend the Sound Mind Sound Body annual summer football camps after he hired Plaintiff onto his MSU football staff in 2013.

21. Defendant Dantonio was a featured speaker at every Sound Mind Sound Body annual summer football camp that he attended.

22. Defendant Dantonio also spoke to television reporters conducting press conferences at Sound Mind Sound Body annual summer football camps.

23. Various MSU football players also attended certain Sound Mind Sound Body annual summer football camps while they were on the MSU football team and they provided instruction to the campers and otherwise participated in the annual summer football camps.

24. Prior to hiring Plaintiff, the SMSB annual summer football camps were the only such camps that Defendant Dantonio had ever attended.

25. The reason Defendant Dantonio attended only the SMSB camp was because he split up his football recruiting of potential players for his MSU football program into geographic terms with Level 1 being those potential players in close proximity to East Lansing, Michigan where the MSU campus is located and into Level 2 and Level 3, being geographic locations farther away.

26. Defendant Dantonio believed that the majority of potential football players that would attend a SMSB annual summer football camp would be within a three hour, two hour, and one hour distance from East Lansing.

27. Numerous student/athletes that attended the annual SMSB summer football camps while they were still in high school, were offered collegiate athletic scholarships by Defendant Dantonio to attend MSU and to play football at MSU.

28. Defendant Dantonio was always treated very well by Plaintiff when he attended the annual SMSB summer football camps.

**Defendant Dantonio Hires Plaintiff**

29. Defendant Dantonio entertained thoughts about hiring Plaintiff for his MSU football staff in the summer of 2013.

30. During Defendant Dantonio's attendance at the the annual SMSB summer football camp in the summer of 2013, Defendant Dantonio spoke with

Plaintiff about potentially accepting on offer of employment on Defendant Dantonio's MSU football staff.

31. During Defendant Dantonio's tenure as MSU's head football coach, Defendant Dantonio had the authority to hire the coaches and staff on the MSU football team.

32. During Defendant Dantonio's visit to Plaintiff's SMSB annual summer football camp in 2013, Defendant Dantonio offered Plaintiff a job on the MSU football staff.

33. The job position required Plaintiff to incorporate aspects of his SMSB annual summer football camp into MSU's football program.

34. The job position provided Plaintiff with a salary and other employment benefits.

35. The job position offered to Plaintiff by Defendant Dantonio was a newly created job position (i.e. the job position did not exist before it was created for Plaintiff).

36. It was Defendant Dantonio's idea to create the new job position. However, the newly created job position was not an 'on-the-field' coaching position.

37. The title of the newly created job position was Director of College Advancement and Performance/Camp Director.

38. Before Plaintiff accepted his new job position on Defendant Dantonio's MSU football staff, Plaintiff negotiated with Defendant Dantonio a provision whereby Plaintiff could work from his home, located in Wayne County, so that he could be with his family.

39. The negotiated provision allowed Plaintiff to work out of his Detroit-area home. Defendant Dantonio agreed to this provision with Plaintiff because Plaintiff lived in the metro-Detroit area, which was a distance from the MSU campus in East Lansing, Michigan.

40. Defendant Dantonio had made no similar provision for any other person that worked on his MSU football staff.

41. The reason Defendant Dantonio did not make any such provision for any other football staff members was because they all lived in or around the East Lansing, Michigan area.

42. Defendant Dantonio expected Plaintiff, as the head of his Recruiting Department, to perform various duties while working from his home. Some of the duties included reaching out to coaches and recruits, preparing itineraries and schedules for official campus visits, and basically do MSU football 'office work' from Plaintiff's home.

43. The reason Defendant Dantonio hired Plaintiff was because of Plaintiff's contacts, which included Plaintiff's association and contacts with many

members of the athletic community that Plaintiff knew through Plaintiff's SMSB annual football camps, and through his contacts with high school and other athletic coaches.

44. Mark Hollis, the former MSU Athletic Director (**"Hollis"**),  was the Athletic Director at MSU in 2013 and was responsible for determining Plaintiff's starting salary for his new job position on the MSU MSU football staff.

45. Defendant Dantonio was enthusiastic about Plaintiff becoming employed on his MSU football staff.

46. In July 2013, Plaintiff accepted Defendant Dantonio's offer of the newly created job position on the MSU football staff.

47. On July 31, 2013, Hollis, and Plaintiff signed the initial one-year employment contract for Plaintiff to serve in the new job position as Director of College Advancement and Performance/Camp Director.

48. Plaintiff's employment contract was renewable from year-to-year at Defendant Dantonio's discretion.

49. Defendant Dantonio oversaw the drafting of the duties and responsibilities, which were attached as Exhibit A to Plaintiff's initial employment contract.

50. Among Plaintiff's responsibilities under the employment contract was for Plaintiff to serve as a mentor to MSU football players.

51. However, Defendant Dantonio never specifically discussed with Plaintiff what he wanted him to do as a mentor to the MSU football players.

## Plaintiff Works for Defendant Dantonio

52. Plaintiff's first football season with MSU on Defendant Dantonio's staff was in the fall of 2013.

53. MSU's 2013 collegiate football team was selected to play a football game in the New Year's Day  Bowl in Pasadena California on January 1, 2014.

54. Plaintiff attended the January 1, 2014 Rose Bowl with the MSU football team. The Rose Bowl trip required the MSU team to fly to California around December 25, 2013 and to return to East Lansing, Michigan on January 2, 2014.

55. During this Rose Bowl trip Plaintiff was involved in team meetings, practices, communicated with players, and participated in discussions about recruiting.

56. Plaintiff was also allowed to be on the field on the MSU sideline during the Rose Bowl game.

57. The National Collegiate Athletic Association(**"NCAA"**) governs inter-collegiate sports competition between colleges and its rules govern the competitions in collegiate sports, including football.

58. Under NCAA rules, Plaintiff, in his new job position, was not an "on the field coach" and thus, was not allowed to recruit potential players off the MSU campus.

59. Specifically, under NCAA rules, Plaintiff was prohibited from going into schools or into potential recruits' homes to meet with potential player recruits and/or their families.

60. On occasions, Plaintiff drove Defendant Dantonio to area schools to recruit players.

61. Defendant Dantonio had Plaintiff stay in the car while Defendant Dantonio went into area schools to meet with the potential recruits.

62. Despite the NCAA rule, there were occasions when Defendant Dantonio mandated Plaintiff to accompany him on a recruiting visit to the home of a potential recruit.

63. One such mandated recruiting visit was to the home of four-star football recruit Daelin Hayes.

64. On December 7, 2015, Plaintiff, Defendant Dantonio, and MSU assistant football coaches Harlan Barnett and Mike Tressell were present during the recruiting visit to the home of four-star recruit Daelin Hayes.

65. Plaintiff was present inside of the home during the entire recruiting visit to the home of four-star recruit Daelin Hayes, which lasted approximately between 1-2 hours.

66. Plaintiff's, Defendant Dantonio's, Harlan Barnett and Mike Tressell's attendance during the recruiting visit to the home of Daelin Hayes was evidenced by an affidavit of La Keshia Neal, Daelin Hayes' mother, which was accompanied by pictures she took during the visit.

67. La Keshia Neal filed her affidavit and the pictures of the visit in Plaintiff's previous lawsuit against Defendant Dantonio, which is no longer pending in the Western District of Michigan, Case No. 18-cv-1261.

68. During his employment at MSU as Director of College Advancement and Performance/Camp Director, Plaintiff had Student Assistants or "interns" on the MSU football staff that reported to him. Plaintiff also had the authority to hire the Student Assistants.

69. During Plaintiff's employment on Defendant Dantonio's MSU football staff, Plaintiff suggested that Defendant Dantonio and other MSU football coaches attend a coaches' clinic in Detroit, Michigan.

70. The annual coaches' clinic that Plaintiff suggested to Defendant Dantonio and his coaches took place at the Horatio Williams Foundation Building in Detroit, Michigan.

71. Defendant Dantonio and his coaches had not previously attended the annual coaches meeting in Detroit before Plaintiff had become employed on Defendant Dantonio's football staff.

72. Defendant Dantonio, the coaches on his football staff, and Plaintiff, all attended this Detroit area coaches meeting each year during Plaintiff's employment on Defendant Dantonio's football staff.

73. Between 60 to 100 youth league, junior high and high school coaches in the Detroit area attended this annual meeting in Detroit Michigan.

74. The purpose of Defendant Dantonio and his coaches attending this annual meeting was a 'goodwill' tour to interact with these coaches.

75. Plaintiff was responsible for arranging the details of the attendance by Defendant Dantonio and the MSU football staff at this annual coaches' meeting in Detroit Michigan.

76. During Plaintiff's employment on Defendant Dantonio's football staff, Plaintiff received financial bonuses whenever MSU football attended post-season bowl games, won the Big 10 Championship and attended the College Football Playoff.

77. Plaintiff also received a 'continuity' bonus during his employment on Defendant Dantonio's MSU football staff.

78. After Defendant Dantonio hired Plaintiff to be on his football staff at MSU, there were occasions in which Plaintiff would drive Defendant Dantonio to recruiting visits to visit potential recruits.

79. Defendant Dantonio was aware that Plaintiff grew up in Detroit, had gone to high school in Detroit, and that Plaintiff knew where the high schools in Detroit were located better than Defendant Dantonio.

80. Defendant Dantonio and former MSU Athletic Director Hollis renewed Plaintiff's employment contract to serve on Defendant Dantonio's MSU football staff each year from 2013 through March 31, 2017.

81. Each year that Defendant Dantonio and Hollis renewed Plaintiff's contract, they raised Plaintiff's salary.  The amount of Plaintiff's raises each year were decided by Defendant Dantonio and Hollis.

82. Defendant Dantonio made the determination each year as to whether Plaintiff's contract should be renewed for another year.

83. In March of 2016, Defendant Dantonio and Hollis increased Plaintiff's salary significantly from $83,435 to $129,000.

84. One of the reasons Defendant Dantonio and Hollis so significantly increased Plaintiff's salary in 2016 was because Michigan Head Football Coach Jim Harbaugh (**"Coach Harbaugh"**) made Plaintiff a lucrative offer to join its football program in a similar job position.

85. Defendant Dantonio did not want to lose Plaintiff to Coach Harbaugh and the University of Michigan football program.

86. The job position offered by Coach Harbaugh to Plaintiff would have paid Plaintiff nearly twice the compensation that Plaintiff had earned while on Defendant Dantonio's MSU football staff.

87. Plaintiff told Defendant Dantonio that he wanted to be loyal to Defendant Dantonio and to MSU and  respectfully declined the offer from Coach Harbaugh.

88. Defendant Dantonio told Plaintiff he appreciated his loyalty.

89. Defendant Dantonio considered himself to be loyal to his football players and coaches.

90. Many of Defendant Dantonio's assistant coaches had been on his football staff for more than 10 years.

91. Upon information and belief, during Defendant Dantonio's years while he was a head football coach at the University of Cincinnati and at MSU, Defendant Dantonio only terminated one (1) coach on his staff during the term of their contract.

92. During his tenure on Defendant Dantonio's MSU football staff, Plaintiff received annual performance evaluations of his job position.

93. Plaintiff's performance evaluations were conducted by either Defendant Dantonio or by Tim Allen from the MSU Athletics staff.

94. Plaintiff always received positive performance evaluations of his job position whether from Defendant Dantonio or from Tim Allen.

95. During his tenure on Defendant Dantonio's MSU football staff, Plaintiff was never disciplined by Defendant Dantonio.

**Players Sexual Assault Incident, Subsequent Police Interview and Arrest of**

96. On January 15, 2017, an alleged sexual assault involving three MSU football players occurred at an off-campus party.

97. Plaintiff hereby incorporates by reference all of the allegations contained in paragraphs 37-53 of Plaintiff's federal complaint filed in Plaintiff's first federal lawsuit (Case No. 18-cv-1261, Docket No. 1, PageID. Nos. 6-8), as if they were fully set forth and stated herein.

98. Plaintiff further incorporates all allegations set forth and a pled in the motion to file a motion for first-amended complaint that was filed under seal in the Western District of Michigan Case against Detectives Davis and Miller as if they were set forth and stated herein.

**Plaintiff's Suspension and
Nonrenewal of his Employment Contract**

99. On February 8, 2017, Plaintiff was arrested by MSU Detectives Chad Davis ("Davis") and Sam Miller ("Miller").

100.    Upon his release from police custody that Detectives Davis and Miller caused, Plaintiff returned to the MSU football building.

101.    Plaintiff immediately informed Defendant Dantonio of his arrest and detention.

102.    The next day, February 9, 2017, Defendant Dantonio, advised Plaintiff, via email, that Plaintiff was immediately suspended and placed on paid administrative leave.

103.    Attached to Defendant Dantonio's email was a memo from Hollis informing Plaintiff that he was to have no further contact with the football program or any of its players pending the outcome of an investigation.

104.    The media immediately learned of Plaintiff's unlawful arrest and detention and defamatory false stories were written about the Plaintiff.

105.    At no time during this period did Defendant Dantonio or Hollis honor the provision in Plaintiff's employment contract, which required that Plaintiff be "provided with an opportunity to speak with the Athletic Director... [p]rior to the imposition of any discipline or corrective action."

106.     Plaintiff was never provided with an opportunity to speak with former

Athletic Director Hollis, prior to the imposition of Plaintiff's suspension

with pay.

107.     Shortly after Plaintiff's arrest on February 8, 2017, MSU engaged

Defendants Jones Day and Gabel to conduct an external investigation of the

football program and of the January 2017 alleged sexual assault incident

involving three MSU football players at an off-campus party.

108.     Because of the illegal and unwarranted arrest and false imprisonment

of Plaintiff by the MSU Police Department Detectives Davis and Miller and

the pending criminal investigation by the MSU Police Department and the

Ingham County Prosecutor, and upon the advice of his legal counsel,

Plaintiff respectfully invoked his constitutional Fifth Amendment right not

to participate in any further interrogations by the MSU Police Department.

109.     Plaintiff also exercised his constitutional First Amendment right not to

speak with or to be interviewed by Defendants Jones Day and Gabel, about

the January 15, 2017 alleged sexual assault incident with three MSU football

players.

110.     Plaintiff's invocation of his First and Fifth Amendment rights, with

respect to the MSU Police and Jones Day interviews, appeared to displease

MSU officials, including but not limited to Defendant Dantonio.

111.    Such invocation of his First and Fifth Amendment rights was prudent for the Plaintiff to exercise given the bad faith demonstrated by the illegal false arrest and false imprisonment, the illegal seizure of his cell phones, the violation of Plaintiff's employment contract and the immediate defamatory and false media stories and coverage instigated by MSU officials, including Defendants.

112.    Upon information and belief, MSU Trustee Joel Ferguson intervened on Plaintiff's behalf and requested that MSU President Simon save Plaintiff from the actions that were taken against him.

113.    Trustee Joel Ferguson expressed to Plaintiff that he was concerned that Plaintiff was going to be discriminated against because of his race.

114.    Trustee Ferguson expressed those same concerns to other MSU employees, management, officers and/or fellow board members.

115.    However, former MSU President Dr. Lou Anna Simon refused to intervene on Plaintiff's behalf for the wrongs he had suffered.

116.    It is believed that MSU President Simon so refused because of the widespread and mounting public pressure on MSU resulting from the MSU Dr. Nassar sexual assaults scandal.

117.    Hollis appeared to have confirmed the reason former MSU President Simons failed to intervene on Plaintiff's behalf when he stated to a media

representative that were it not for the Nassar scandal, Plaintiff would not have been treated so poorly.

118.    Before the expiration of Plaintiff's employment contract on March 31, 2017, Hollis and Defendant Dantonio extended the employment contract on a month-to-month basis.

119.    Plaintiff's employment contract was extended on a month-to-month basis pending the outcome of the Defendant Jones Day's and the MSU Police and Ingham County Prosecutor's investigations.

120.    Plaintiff's employment contract term was so extended twice, once for the period April 1, 2017 to April 30, 2017 and again for the period May 1, 2017 to May 31,2017.

121.    On or about May 22, 2017, Defendant Dantonio, while on a train on vacation with his family in Italy, called Plaintiff on his cell phone and advised Plaintiff that Defendant Dantonio "had to move in a different direction with the position", or words to that effect, and that he would not be renewing Plaintiff's employment contract.

122.    Defendant Dantonio and other MSU officials have offered many and varying explanations for not renewing Plaintiff's employment contract.

123.    The many and varying explanations given by Defendant Dantonio and other MSU officials were inconsistent and even contradictory.

124.    On May 22, 2017, Kristine Zayko, who was employed in the position of MSU Deputy General Counsel, had communications with Defendant Dantonio regarding not renewing Plaintiff's employment contract.

125.    On May 22, 2017, Ms. Zayko also sent an email to Plaintiff's counsel, which stated, in part:

> "Over the last several months, a staffing review has been conducted within the football program. Based on the feedback received during that review, as well as the concerns that have arisen regarding your job performance, Coach Dantonio has determined that your contract should not be extended."

126.    The next day, May 23, 2017, Ms. Zayko sent another email to Plaintiff's counsel, which stated, in part:

> "the relevant text from the intended notice to your client will now read: "Over the last several months, a staffing review has been conducted within the football program. Based on feedback received during that review, as well as concerns regarding a potential conflict of interest with your outside activities, Coach Dantonio has determined that his program will move in a different direction and your contract will not be extended.""

127.    Despite the wording stated by Ms. Zayko in her May 23rd, 2017 email, MSU's "official" May 24, 2017 notice to Plaintiff informing him that his employment would not be renewed did not include any of the wording so offered in the MSU Deputy General Counsel's emails dated May 22 & 23, 2017.

128.   Rather, the reason now stated in Defendant Dantonio's and MSU's "official" May 24, 2017 notice to Plaintiff, was that "[a]s Coach Dantonio discussed with you earlier this week, he has determined that his program will move in a different direction and your contract will not be extended."

129.   On or about June 6, 2017, Plaintiff received and reviewed a copy of Defendants Jones Day and Gabel's written report detailing their findings from their external investigation on behalf of MSU was released publicly.

130.   On June 6, 2017, Defendant Dantonio appeared at a press conference at MSU's football Spartan Stadium.

131.   During the June 6, 2017 press conference, Defendant Dantonio stated that Plaintiff's employment contract was not renewed because of "philosophical differences".

132.   During the June 6, 2017 press conference, Defendant Dantonio also referenced Defendants Jones Day and Gabel's written findings from their external investigation.

## V. CAUSES OF ACTION

## COUNT I

**Plaintiff's As-Applied Challenge to MSU'S RVSM Policy Cited in Defendants Jones Day and Gabel's June 2017 Written Report.**

133.    Plaintiff repeats, realleges and incorporates, the foregoing allegations, as though fully set forth and stated herein.

134.    This claim is brought against Defendants Jones Day and Gabel pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act.

135.    Shortly after Plaintiff's arrest on February 8, 2017, MSU engaged Defendants Jones Day and Gabel to conduct an external investigation of the football program and the alleged sexual assault involving three MSU football players on January 15, 2017.

136.    As a result of being hired by MSU to conduct this "independent" investigation on the university's behalf, Defendants Jones Day and Gabel were clearly acting as agents of MSU.

137.    As agents of MSU, Defendants Jones Day and Gabel are state actors for purposes of Plaintiff's as-applied constitutional challenge claim brought under 42 USC §1983.

138.    In a letter dated May 24, 2017, Megan Vanderveen, Assistant Athletics Director for MSU, informed the Plaintiff that his employment contract would

not be renewed and/or extended, and Plaintiff was directed to return "any University equipment and to schedule your end of contract exit interview."

139.    Nearly two weeks later, MSU officials publicly released the written report authored by Defendants Jones Day and Gabel, detailing their investigation into the alleged sexual assault involving three MSU football players on January 15, 2017.

140.    Plaintiff was informed of the release of the Defendants Jones Day and Gabel's written report on or about June 6, 2017.

141.    Plaintiff obtained a copy of Defendants Jones Day and Gabel's written report on or about June 6, 2017.

142.    Plaintiff was unaware of the contents of Defendants Jones Day and Gabel's written report prior to June 6, 2017.

143.    Defendants Jones Day, and Gabel's June 2017 written report gratuitously added and falsely concluded that Plaintiff violated MSU's Policy on Relationship Violence & Sexual Misconduct.

144.    Specifically, Defendants Jones Day and Gabel's June 2017 written report falsely concluded that Plaintiff violated the RVSM Policy by allegedly conducting his own investigation into the alleged sexual assault involving three MSU football players on January 15, 2017 by speaking with the three

football players that were involved in the alleged sexual assault and by speaking with the father of one of player's about the alleged incident.

145.    Contrary to Defendants Jones Day and Gabel's conclusions, at no time did Plaintiff conduct his own investigation into the alleged sexual assault involving three MSU football players on January 15, 2017.

146.    Defendants Jones Day and Gabel's conclusion in their June 2017 written report that Plaintiff conducted his own investigation into the alleged sexual assault involving three MSU football players on January 15, 2017 was false and defamatory.

147.    Defendants Jones Day and Gabel's June 2017 written report also falsely concluded that Plaintiff violated the MSU RVSM Policy by not reporting the alleged sexual assault to MSU's OIE and to the MSU Police Department.

148.    Plaintiff, as a citizen, exercised his First Amendment right not to speak with officials from the OIE and the MSU Police Department about the alleged sexual assault.

149.    Defendants Jones Day and Gabel's conclusion that Plaintiff violated the RVSM Policy by not reporting the alleged sexual assault to the OIE and MSU Police Department was false and defamatory because the MSU RVSM Policy, as applied to the Plaintiff, violated Plaintiff's First Amendment right not to speak.

150.     Notably, although Defendants Jones Day and Gabel's June 2017 written report falsely concluded that Plaintiff violated MSU's RVSM Policy, Defendants Jones Day and Gabel's June 2017 written report purposely did not mention that Defendant Dantonio **failed** to personally report the alleged sexual assault to the MSU Police Department.

151.     By not reporting the alleged sexual assault to the OIE and MSU Police Department, Plaintiff, as a citizen, exercised his First Amendment right not to speak.

152.     Plaintiff was speaking as a citizen and not as an employee when he chose not to report and/or speak with officials from the OIE and MSU Police Department about the alleged sexual assault involving three MSU football players on January 15, 2017.

153.     The alleged sexual assault of the female student by the three (3) MSU football players and the subsequent criminal investigation of the alleged sexual assault were matters of public concern.

154.     Although Plaintiff, as an employee of MSU, was a mandatory reporter under the RVSM Policy, as a citizen, Plaintiff may choose to exercise his First Amendment right not to speak with officials from the OIE and MSU Police Department about the alleged sexual assault involving three MSU football players on January 15, 2017.

155.     The university's RVSM Policy, as applied to the Plaintiff by the Defendants Jones Day and Gabel, is unconstitutional because the MSU RVSM Policy violated Plaintiff's First Amendment right not to be compelled to speak.

156.     Plaintiff's interest in protecting and exercising his Frist Amendment rights outweigh any interest the Defendants Jones Day and Gabel may have had in enforcing the MSU's unconstitutional RVSM Policy against the Plaintiff.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants Jones Day and Gable as follows:

a. compensatory damages in whatever amount above $75,000.00 Plaintiff is found to be entitled;
b. an award of lost wages and the value of fringe benefits, past and future;

c. an award of exemplary and punitive damages;

d. an award of interest, costs and reasonable attorney fees under 42 USC §1988;
e. a declaration that the university's RVSM Policy, as applied to the Plaintiff by Defendants Jones Day and Gable, violates Plaintiff's First Amendment right not to speak; and
f. an order awarding whatever other equitable relief appears appropriate at the time of final judgment.

## COUNT II

### First Amendment Retaliation Claim Against Defendants Jones Day and Gabel.

157.     Plaintiff repeats, realleges and incorporates, the foregoing allegations, as though fully set forth and stated herein.

158.     This claim is brought against Defendants Jones Day, Wooley, and Gabel pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act.

159.     Shortly after Plaintiff's arrest on February 8, 2017, MSU engaged Defendants Jones Day and Gabel to conduct an external investigation of the football program and the alleged sexual assault involving three MSU football players on January 15, 2017.

160.     As a result of being hired by MSU to conduct this "independent" investigation on the university's behalf, Defendants Jones Day and Gabel were clearly acting as agents of MSU.

161.     As agents of MSU, Defendants Jones Day and Gabel are state actors for purposes of Plaintiff's First Amendment retaliation claim brought under 42 USC §1983.

162.     Upon his release from police custody, Plaintiff returned to the MSU football building Plaintiff immediately informed Defendant Dantonio of the arrest and detention.

163.     The next day, February 9, 2017, Defendant Dantonio advised Plaintiff, via email, that Plaintiff was immediately suspended and placed on paid administrative leave.

164.     Attached to Defendant Dantonio's email was a memo from Hollis informing Plaintiff that he was to have no further contact with the football program or any of its players pending the outcome of an investigation.

165.     Suspiciously, almost instantly the media learned of Plaintiff's unlawful arrest and began writing defamatory stories about Plaintiff and his alleged involvement in the players' sexual assault incident.

166.     Sometime after Plaintiff was suspended with pay, Defendants Jones Day and Gable attempted to interview Plaintiff as part of their investigation on behalf of MSU.

167.     However, Plaintiff, as a citizen, chose to exercise his First Amendment right not to speak with Defendants Jones Day and Gable.

168.     Defendants Jones Day and Gable were not pleased that Plaintiff refused to speak with them.

169.     Defendants Jones Day and Gabel conspired with officials from MSU, including but not limited to Defendant Dantonio and former MSU Athletic Director Hollis, to generate a biased report against the Plaintiff in an effort to help and possibly cover up for Defendant Dantonio.

170.     Upon information and belief, Defendants Jones Day and Gable's investigation was not truly "independent". Rather it was "manufactured" and "staged" in an effort to make it look as if Defendant Dantonio did not break any laws or university policies and make Plaintiff look like the "bad guy".

171.     Defendant Jones Day has a history of conspiring with governmental entities in order to carry out hidden political agendas.

172.     For example, in either 2012 or 2013, it was discovered, through the release of company emails from the Defendant Jones Day, that former Michigan Governor Rick Snyder and his former assistant, Richard Baird, conspired with officials from Defendant Jones Day to have one of their partners, Kevin Orr, to serve as the Emergency Manager for the City of Detroit before a financial emergency was declared under state law.

173.     As a result of Plaintiff exercising his First Amendment right not to speak with Defendants Jones Day and Gable, Defendants Jones and Gable retaliated against the Plaintiff by publishing in their June 2017 written report information that was damaging to Plaintiff's reputation and good name.

174.     Plaintiff exercising his right not to speak was a substantial or motivating factor in Defendants Jones Day and Gable electing to publish in their June 2017 written report information that was damaging to Plaintiff's reputation and good name.

175.    Upon the public release of Defendants Jones Day and Gable's June 2017 written report, negative news stories were written about the Plaintiff.

176.    As a result of the false accusations contained in Defendants Jones Day and Gable's June 2017 written report, Plaintiff has been unable to find a similar job he had with the MSU football program with any other university.

177.    Specifically, Plaintiff has been unable to get a similar job he had with the MSU football program with any other university.

178.    In fact, in January 2019, Plaintiff was told by Kansas University's head football coach Les Miles that he could not hire Plaintiff in a similar position, which Plaintiff believes was due in part to some of the allegations alleged in Defendants Jones Day and Gabel's June 2017 written report and the police reports and documents released by Detectives Davis and Miller and MSU.

179.    The adverse action Defendants Jones Day and Gable took by publishing certain information in their June 2017 written report was deliberate and intentional to besmirch Plaintiff's good name and reputation.

180.    As further evidence that Defendants Jones Day and Gable's June 2017 written report was "manufactured" and intended to retaliate against Plaintiff for not speaking to them, Defendants Jones Day and Gable failed to mention that in April 2017, Plaintiff was granted immunity from prosecution from the

Ingham County Prosecutor with respect to the false allegations MSU Detectives Davis and Miller falsely asserted.

181.    No criminal charges were ever brought against the Plaintiff with respect to the criminal investigation of the sexual assault involving the three (3) MSU football players.

182.    Defendants Jones Day and Gabel deliberately and intentionally omitted this important information from their June 2017 written report.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants Jones Day and Gable as follows:

a.  compensatory damages in whatever amount above $75,000.00 Plaintiff is found to be entitled;

b.  an award of lost wages and the value of fringe benefits, past and future;

c.  an award of exemplary and punitive damages;

d.  an award of interest, costs and reasonable attorney fees under 42 USC §1988;

e.  a declaration that the Defendants Jones Day and Gable retaliated against Plaintiff for exercising his First Amendment right not to speak by publicizing information that was damaging to Plaintiff's good name and reputation; and

f.  an order awarding whatever other equitable relief appears appropriate at the time of final judgment.

**COUNT III**
**First Amendment Retaliation Claim Against Defendants Kienbaum and Dantonio.**

183.     Plaintiff incorporates, repeats, and realleges the foregoing allegations as though they were fully set forth and stated herein.

184.     This claim is brought against Defendants Kienbaum and Dantonio pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act.

185.     Defendant Kienbaum was hired to serve as outside counsel to represent Defendant Dantonio, Hollis and Simon in Plaintiff's first federal lawsuit, *Blackwell v Simon, et. al*., 18-cv-1261, which remains pending in the U.S. District Court for the Western District of Michigan against Detectives Chad Davis and Sam Miller only.

186.     During the pendency of Plaintiff's first federal lawsuit against Defendant Dantonio, Plaintiff has made public statements about Defendant Dantonio's possible unethical conduct.

187.     Plaintiff has made public statements about Defendant Dantonio's mishandling of former MSU football player Auston Robertson and Plaintiff has been outspoken about Defendant Dantonio's possible misconduct as the head football coach.

188.     The comments Plaintiff has made to the press about Defendant Dantonio, along with Plaintiff's meritorious first federal lawsuit pending in

the Western District of Michigan, have upset Defendants Kienbaum and Dantonio.

189.    Plaintiff's exercise of his First Amendment rights of speaking negatively about Defendant Dantonio to the press and Plaintiff filing his first federal lawsuit, have caused Defendants Kienbaum and Dantonio to retaliate against Plaintiff by seeking out potentially damaging information about the Plaintiff and having that damaging information published by media publications.

190.    As a way of retaliating against the Plaintiff for filing his first federal lawsuit against Defendant Dantonio and speaking negatively about Defendant Dantonio to the press, Defendants Kienbaum and Dantonio conspired and made statements to MLive pertaining to alleged NCAA violations Defendants Dantonio and Kienbaum believed were committed by the Plaintiff.

191.    In a January 30, 2020 article,[1] MLive quoted Defendant Kienbaum as stating the following:

> "Any assertion that there was a NCAA violation at any time, other than
> Mr. Blackwell's, which is a matter of record, let alone disclosed by this

---

[1] See January 30, 2020 MLive article titled: "Dantonio's Lawyer calls lawsuit claims of possible Major NCAA Violations by MSU 'False'". https://www.mlive.com/sports/2020/01/dantonioslawyer-calls-lawsuit-claims-of-possible-major-ncaa-violations-false.html

deposition, is false…..In fairness, if Blackwell wants to talk about NCAA violations," Kienbaum said, "the only one that we're familiar with in this context is the one that he caused. … It was Curtis Blackwell's action in trying to peddle his camp to Rutgers and Maryland at a time when he was still on the payroll of Michigan State."

192.    These comments made by Defendant Kienbaum, which were made with the approval and at the request of his client, Defendant Dantonio, were damaging to Plaintiff's good name and reputation.

193.    These comments made by Defendant Kienbaum, which were made with the approval and at the request of his client, Defendant Dantonio, were made during a personal one-on-one interview with a reporter from MLive.

194.    These comments made by Defendant Kienbaum, which were made with the approval and at the request of his client, Defendant Dantonio, were **not** made in the courtroom nor during any court proceedings.

195.    These comments made by Defendant Kienbaum, which were made with the approval and at the request of his client, Defendant Dantonio, were made on Defendant Kienbaum's personal time.

196.    Additionally, information pertaining to any possible NCAA violations allegedly committed by Plaintiff has not been the subject of any filing filed by the defendants in Plaintiff's first federal lawsuit.

197.     Defendants Kienbaum and Dantonio took this adverse action of having damaging information printed and disseminated about the Plaintiff was in retaliation for Plaintiff filing his first federal lawsuit against Defendant Dantonio and for Plaintiff speaking negatively to the press about Defendant Dantonio and the MSU football program.

198.     Statements like Defendant Kienbaum's in the January 30, 2020 MLive article have severely hampered Plaintiff's ability to get a similar job with another university's football program.

199.     Defendant Kienbaum conspired with Defendant Dantonio to retaliate against the Plaintiff.

200.     Specifically, Defendant Kienbaum spoke with Defendant Dantonio about possible ways to embarrass and dig up "dirt" on the Plaintiff.

201.     Defendants Kienbaum and Dantonio wanted to ruin and embarrass the Plaintiff by exposing and publicizing possible damaging and embarrassing information about the Plaintiff that the public was possibly unaware of.

202.     Defendant Kienbaum offered to use his subpoena power in Plaintiff's first federal lawsuit to dig up "dirt" on the Plaintiff to have publicized in the same manner as Plaintiff has exposed Defendant Dantonio's alleged misconduct.

203.     With approval from Defendant Dantonio, Defendant Kienbaum

subpoenaed the NCAA, Rutgers, and other NCAA institutions in an effort to

dig up "dirt" on the Plaintiff.

204.     Using the information he obtained from subpoenaing the NCAA,

Rutgers and other NCAA institutions, Defendant Kienbaum, with

permission and authorization from Defendant Dantonio, publicized in the

January 30, 2020 MLive article damaging information about NCAA

violations that were allegedly committed by the Plaintiff.

205.     Defendants Kienbaum and Dantonio's actions were deliberate and

intentional in an effort to retaliate against the Plaintiff.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against

Defendants Kienbaum and Dantonio as follows:

a. compensatory damages in whatever amount above $75,000.00 Plaintiff is found to be entitled;

b. an award of lost wages and the value of fringe benefits, past and future;

c. an award of exemplary and punitive damages;

d. an award of interest, costs and reasonable attorney fees under 42 USC §1988;

e. a declaration that the Defendant Kienbaum conspired with Defendant Dantonio to retaliate against Plaintiff for exercising his First Amendment rights by publicizing information that was damaging to Plaintiff's good name and reputation;

f. a declaration that the Defendants Dantonio and Kienbaum retaliated against Plaintiff for exercising his First Amendment rights by publicizing

information that was damaging to Plaintiff's good name and reputation; and

g.  an order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated: June 6, 2020                    Respectfully submitted,

                                       */s/ ANDREW A. PATERSON*
                                       ANDREW A. PATERSON (P18690)
                                       Attorney for Plaintiff
                                       2893 E. Eisenhower Pkwy
                                       Ann Arbor, MI 48108
                                       (248) 568-9712
                                       aap43@outlook.com

## JURY DEMAND

Plaintiff, through counsel, demands a jury trial on all issues triable to a jury.

Dated: June 6, 2020                    Respectfully submitted,
                                       */s/ ANDREW A. PATERSON*
                                       ANDREW A. PATERSON (P18690)
                                       Attorney for Plaintiff
                                       2893 E. Eisenhower Pkwy
                                       Ann Arbor, MI 48108
                                       (248) 568-9712
                                       aap43@outlook.com